Submitted June 1, affirmed November 23, 2022

In the Matter of C. J.,
a Person Alleged to have Mental Illness.
STATE OF OREGON,
*Respondent,*

*v.*

C. J.,
*Appellant.*

Clackamas County Circuit Court
21CC05044; A176929

522 P3d 540

Appellant contests an order committing her to the Oregon Health Authority based on a finding that she had a mental disorder and constituted a danger to herself and to others. Appellant argues that the evidence was not legally sufficient to support that determination. *Held*: The trial court found that appellant had homicidal ideations toward a specific person, took specific actions toward that person—including driving to that person's home while in possession of a wood-splitting maul and pepper spray—and also researched bomb making materials and methods. Each of those actions took place after appellant was receiving intensive outpatient mental health care following a previous hospitalization for suicidal ideations. In the context of this case, the trial court did not err by concluding that absent commitment, appellant was highly likely to engage in future acts of violence.

Affirmed.

Thomas J. Rastetter, Judge.

Joseph R. DeBin and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Rebecca M. Auten, Assistant Attorney General, filed the brief for respondent.

Before Shorr, Presiding Judge, and Mooney, Judge, and Pagán, Judge.

PAGÁN, J.

Affirmed.

**PAGÁN, J.**

Appellant seeks reversal of an order involuntarily committing her to the Oregon Health Authority for a period of not more than 180 days, arguing that the evidence was not legally sufficient to establish that she had a mental disorder that caused her to be a danger to herself or to others. ORS 426.130(1)(a)(C); ORS 426.005(1)(f)(A). We conclude that there was legally sufficient evidence to support the trial court's conclusion that appellant was a danger to others within the meaning of ORS 426.005(1)(f)(A); we therefore need not reach the question of whether the evidence was also sufficient to support the court's determination that she was a danger to herself. We affirm.

In an appeal from an involuntary commitment order, we view the evidence and draw permissible inferences in favor of the trial court's disposition, and determine whether the record was legally sufficient to permit the outcome.[1] *State v. S. E.*, 313 Or App 678, 679, 496 P3d 1140 (2021). We state the facts in accordance with that standard.

Appellant had been diagnosed with major depression and post-traumatic stress disorder (PTSD) and had been involved with "intensive outpatient" mental health care. During an interview shortly before the commitment hearing, the county mental health investigator observed symptoms including "rapid and pressured speech, increased goal-directed activity, increased energy, decreased need for sleep, some paranoia, [and] potentially some delusional thought content that remains to be verified." The symptoms started between four and six months before the hearing and "have kind of continually progressed since then."

In the days before the commitment hearing, appellant drove to what she believed was the home of a prominent conservative internet journalist. Appellant located the home during some internet research and drove to the home with a wood-splitting maul and pepper spray. Appellant knocked on the door of the home and when no one answered the door,

---

[1] Neither party requested *de novo* review of the record and this is not the type of exceptional case where we would exercise our discretion to conduct a *de novo* review. ORAP 5.40(8)(c).

she left. During interviews with the county mental health investigator, appellant minimized the danger of confronting the journalist—an individual she believes to incite violence in the Portland area—despite her slight stature and wrist injury. Although appellant characterized going to the journalist's home as "more of a fantasy," one of the psychiatrists who interviewed appellant noted that "when a fantasy has been stretched to the point where you're physically showing up at someone's door is incredibly concerning."

In addition to the incident with the maul and pepper spray, there have been "several mentions of suicidal ideation, including a prior hospitalization [a few months prior] for suicidal ideation." In the time before the hearing, appellant expressed "significant hopelessness" and feelings "typically associated with suicidal ideation or at least a desire to be dead, which is seen as a precursor." Entries in appellant's medical record, recounted through the investigator and a psychiatrist, referenced "going out in a blaze of glory" and that appellant had said "Listen, if I'm going to kill myself, I'm going to take a bad person out with me." One psychiatrist noted, "[i]t would be different if this was all hypothetical and she wasn't actually gathering items, gathering an axe, gathering Mace, and physically showing up on somebody's door. That's next level stuff." That psychiatrist also thought that "[appellant is] just as angry as she was when she was engaged in these activities initially."

The investigator and a psychiatrist also explained references in appellant's medical records to her "researching bomb making" that were "associated with threats made specifically toward different political figures." That conduct included "writing down items that [appellant] would need to construct a bomb," but appellant minimized that as related to her interests as a science teacher.

Finally, although neither the county mental health investigator nor the interviewing psychiatrist was sure that appellant would carry out the plan to attack the journalist, both were concerned that absent intervention, the likelihood appellant would attempt to harm others was "concerning." Both also expressed concern that the journalist episode happened while appellant was on the "highest level of outpatient

treatment available." The county investigator noted that there had been some "significant difficulties" with appellant taking the prescribed medications, but the psychiatrist remarked that appellant had been "cooperative with medications during the course of the [present] hospitalization."

Appellant testified on her own behalf and explained that she only had a "visualization" to "put pepper spray on the doorknob" but that she did not follow through with that visualization and instead went to an appointment with her clinical psychologist. Appellant did not think that hospitalization would happen as a result of going to the journalist's home, and now knowing that, she would "absolutely not" do that again.

Ultimately, the trial court concluded that appellant suffered from a mental disorder and that she was a danger to both herself and to others. The court noted that appellant was already on intensive outpatient treatment when she went to the journalist's home and researched bomb making.

On appeal, appellant contends that the record lacks sufficient evidence that due to a mental health condition that she was a danger to herself or others. According to appellant, because she had not taken any suicidal actions, lacked a history of any actual violent behavior, and was cooperative during her hospitalization before the hearing, the court's findings were erroneous.

In Oregon, a person may not be involuntarily committed unless the trial court finds by clear and convincing evidence that the person is a "person with mental illness," and that institutional treatment is in the best interest of the person. ORS 426.130(1)(a)(C). A "person with mental illness" is someone who suffers from a "mental disorder" and that as a result of that disorder, is a danger to self or others. ORS 426.005(1)(f)(A). A person is a danger to others if their

"mental disorder makes [them] highly likely to engage in future violence toward others, absent commitment. That determination is based on the person's condition at the time of the hearing as understood in the context of [their] history. Further, conclusions about appellant's dangerousness based on conjecture are not enough; actual future violence must be highly likely. Evidence of past violent acts must

provide a foundation to predict future dangerousness, not merely describe past isolated incidents."

*State v. S. E.*, 313 Or App at 682. In view of the clear-and-convincing-evidence standard of proof that applies in civil commitment proceedings, the question for us as the reviewing court is whether a rational factfinder could have found that it was highly probable that appellant was a danger to others because of a mental disorder. *Id.* at 683. Viewing the record in the light most favorable to the trial court's determination, we conclude that the record contains legally sufficient evidence to support the determination that appellant was dangerous to others.

Appellant had homicidal ideations toward the journalist, researched the apparent location of his home, and then went to his home with a maul and pepper spray. There was also evidence in the record that appellant researched bomb making and recorded a list of required materials in connection with her statements about various political figures. Appellant "still [had] a tremendous amount of anger within her," and the anger was the same as when the dangerous conduct started. And during the "incredibly concerning" episode—going to the journalist's home with a maul and pepper spray—appellant was already on "intensive outpatient" mental health care.

Appellant's mental illness symptoms progressively increased in the months leading up to the time of the hearing. Shortly before the hearing, appellant took affirmative steps to locate and physically go to the journalist's home, armed with a maul and pepper spray. She did not actually harm the journalist because he did not answer the door when she knocked. That sequence of behavior in the context of appellant's increasing symptoms of depression and PTSD, and her reluctance to take her prescribed psychiatric medications on an outpatient basis, is clear evidence that she was highly likely to engage in future violence toward others if not involuntarily committed. Therefore, the trial court did not err in committing appellant based on a determination that she was a danger to others within the meaning of ORS 426.005(1)(f)(A).

In arguing for reversal of the order, appellant characterizes the conduct as "delusional," but without the required nexus to "actual harm to others" required to support a commitment order under ORS 426.005 and ORS 426.130. Although the record does not contain evidence of actual acts of violence toward others, specific acts of violence are not required to establish dangerousness. *State v. C. L.*, 313 Or App 539, 542, 495 P3d 748 (2021). As we explained in *State v. B. P.*, 229 Or App 487, 493, 211 P3d 975 (2009) (citations omitted), threats of future violence "accompanied by some overt act indicating intent to follow through on the threat[s], or * * * made under unusual circumstances that make actual future violence highly likely" can constitute clear and convincing evidence of dangerousness. When such circumstances exist, as they did here, a trial court is not required to "wait until appellant actually harm[s] someone before finding [them] a danger to others." *State v. K. S.*, 223 Or App 476, 486, 196 P3d 30 (2008).

Because we conclude that the trial court correctly found that appellant was a danger to others, appellant's argument regarding the trial court's finding that she was a danger to herself under ORS 426.005(1)(f)(A) would not change the outcome of this appeal.

Affirmed.